NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0208n.06

Nos. 11-3219/11-3760

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Feb 27, 2013*
DEBORAH S. HUNT, Clerk

BOUBAKARY KABA,                          )
                                         )
    Petitioner,                          )
                                         )
                                         )    ON PETITION FOR REVIEW
v.                                       )    OF AN ORDER OF THE
                                         )    BOARD OF IMMIGRATION APPEALS
ERIC  H.  HOLDER,  JR., United  States   )
Attorney General,                        )
                                         )
    Respondent.                          )

Before:  SILER, DAUGHTREY, and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  The petitioner, Boubakary Kaba, is a native and citizen of Cote d'Ivoire who seeks review of decisions by the Board of Immigration Appeals dismissing his appeal from the immigration court and denying his motion to reopen deportation proceedings.  The Board ordered him removed based on the immigration judge's decision denying his applications for asylum, withholding of removal, and protection under the U. N. Convention Against Torture.  Kaba moved to reopen, arguing that in the 15 months following the merits hearing in his case, conditions in Cote d'Ivoire had deteriorated to such an extent that he would face certain persecution if he were removed to Cote d'Ivoire.  The Board denied the motion, holding once again that Kaba had not established *prima facie* eligibility for asylum, in spite of the new information

attached to his motion to reopen. Although that information reflected the existence of violence and civil strife affecting the country as a whole, the Board determined that it did not support a finding that Kaba would be singled out for persecution upon return or that there existed a pattern or practice of persecution of similarly-situated persons in Cote d'Ivoire. It therefore concluded that, based on the new information, Kaba still had failed to demonstrate an objectively reasonable fear of future persecution. Because the denial of relief is supported by substantial evidence, we must deny Kaba's petitions for review.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2003, Kaba filed an application for asylum and withholding of removal with the Department of Homeland Security. He claimed to have entered the United States using a false passport in December 2002, but he produced no proof to confirm his date of entry. After Kaba failed to appear at his scheduled interview, the Department of Homeland Security determined that he was subject to removal and ordered him to appear in front of an immigration judge and show cause why he should not be removed from the United States. At that proceeding, Kaba conceded removability but again indicated his desire to apply for asylum, withholding of removal, and relief under the Convention Against Torture. In August 2009, he filed an amended application for asylum, in which he claimed that he had been persecuted in the past and that he feared that, because of his Dioula ethnic background, he would be killed if he returned to Cote d'Ivoire.

Kaba's claims of persecution were based on a failed coup attempt in 2002 that split control of Cote d'Ivoire between the rebel New Forces in the north and the official government in the south. The situation eventually evolved into a full-fledged rebellion. In 2004, after the failure of peace accords, the United Nations sent 6,000 peacekeepers to join the 4,000 French peacekeepers already in the country. In 2007, the president and the rebel leader signed a peace agreement, which mandated elections and dismantled the zone dividing the north and south. On October 31, 2010, the country held its first presidential election in 10 years. After losing the election to Alassane Ouattara in a runoff, the incumbent president, Laurent Gbagbo, refused to leave office. The two men took separate oaths of office and remained in a standoff over the presidency until the capture of Gbagbo on April 11, 2011.

At the hearing before an immigration judge in January 2010, Kaba was the only witness. He testified that he was an ethnic Dioula born in Boundiali, in northern Cote d'Ivoire. He said that during the 2002 rebellion in the northern part of the country, many Dioulas were associated with rebel forces. According to Kaba, in December of that year, 12 "gendarmes" – secret police loyal to then-President Gbagbo – came to his shop and accused him of being involved with the rebels. Kaba testified that one of the gendarmes hit him with his rifle butt while others kicked him; that he was handcuffed and taken outside, where he saw other Dioulas who were also being detained; and that he witnessed the gendarmes kill two Dioulas who tried to escape. When he denied involvement with the rebel forces, the gendarmes beat him and threatened to kill him. Kaba said that he was

jailed for five days before rebels attacked the city, stormed the jail, freed the prisoners, and killed all the gendarmes who had detained him.

Kaba also testified that he tried to return home but could not, because government forces were fighting insurgent rebels in his neighborhood. He went instead to his aunt's house, where he learned that gendarmes had killed his parents and siblings. He said that he took his passport, identification card, and birth certificate from his aunt and boarded a bus for Mali. According to Kaba, as they neared the border, gendarmes stopped the bus and confiscated his passport and identification card. He claimed that one of the gendarmes recognized him and threatened to kill him. The gendarmes then stopped a second bus and, while their attention was diverted, Kaba joined a group that fled across the Malian border.

In Mali, Kaba testified, he met a man who helped him travel to the United States using a false passport and find work in Cincinnati, Ohio. He further testified that in 2005, he went to Seattle, Washington, where his birth certificate was confiscated during a raid by immigration agents. He claimed that he was not placed into immigration proceedings at that time "because they were looking for a particular person." Kaba concluded his testimony by expressing fear that he would be killed if he returned to Cote d'Ivoire. The stated basis for his fear was a phone conversation with his aunt in 2003, during which he claimed that she told him not to return home because "securities" were looking for him. He told the immigration judge that he had not spoken with anyone in Cote D'Ivoire since that

phone call over six years earlier because he no longer had the address or phone number of anyone living there.

At the conclusion of the hearing, the immigration judge delivered an oral opinion denying Kaba's requests for relief and ordering him removed to Cote d'Ivoire. After addressing several inconsistencies in Kaba's testimony and asylum applications, the immigration judge found that Kaba was not credible. He also found that Kaba was subject to the one-year asylum bar because he failed to establish, by clear evidence, the time, place, and manner of his entry into the United States. The immigration judge next determined that, because Kaba failed to establish a nexus between the beating he described and a protected ground, he had not met his burden of establishing past persecution and was therefore not entitled to a presumption of well-founded fear of future persecution. Alternatively, the immigration judge held that Kaba could not demonstrate an objectively reasonable fear of future persecution. He determined that, by the time of the hearing on January 27, 2010, the civil war in Cote D'Ivoire had ended, international authorities had intervened, the gendarmes that allegedly persecuted Kaba were, by his own admission, long dead, and the report that he was being sought by security forces was both uncorroborated and more than five years old. The immigration judge concluded that the 2008 State Department country report "d[id] not support that [Kaba] would be

specifically targeted [or] that it would be likely that he would be subjected to future persecution in the Ivory Coast."[1]

Without relying on the immigration judge's credibility determination, the Board dismissed Kaba's appeal. Based on the record, we conclude that the Board could have denied relief on any one of the bases articulated by the immigration judge. But, specifically, the Board agreed with the immigration judge's determination that "the end of the civil war in [Cote d'Ivoire], the intervention of the United Nations, as well as the death of the gendarmes that allegedly detained [Kaba] in 2002, establish that the respondent's fear of returning to [Cote d'Ivoire] is no longer objectively reasonable." Because the asylum claim depended on Kaba's own "self-serving statements" and referred only to overall conditions in Cote d'Ivoire, the Board held that Kaba had failed to meet his burden of proving risk of future persecution in light of the fundamental change in circumstances. The Board concluded that because he failed to establish his eligibility for asylum, Kaba necessarily failed to establish his eligibility for withholding of removal and protection under the Convention Against Torture. *See Vasha v. Gonzales*, 410 F.3d 863, 875 (6th Cir. 2005). The Board dismissed Kaba's appeal on February 16, 2011, and Kaba filed a petition to review that decision in this court on March 3, 2011.

---

[1] Kaba's contention that the presumption of future persecution cannot be rebutted solely on the basis of country reports is not supported by the law of this circuit. *See Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006) (holding that country reports "constitute substantial evidence supporting the conclusion that country conditions in Albania have improved to the point that any presumption of a well-founded fear of future persecution is rebutted").

On April 20, 2011, Kaba filed a motion to reopen, pursuant to 8 U.S.C. § 1229a(c)(7)(C)(ii). In his brief in support of the motion to reopen, he challenged the Board's determination that there had been a change in circumstances sufficient to rebut a well-founded fear of future persecution. According to Kaba, the later 2010 State Department country report detailed extreme violence in Cote d'Ivoire in the 15 months after the merits hearing, so as to require a remand to the immigration court for consideration of his claims. That report, which was attached to Kaba's motion to reopen, indicated that political instability in Cote d'Ivoire prior to the election and the arrest of Gbago led to various human rights abuses on both sides, including "arbitrary and unlawful killings" by Gbago's security forces, torture and other inhumane punishment, rape of civilians, illegal arrests and detentions, denial of fair public trial, "sometimes life-threatening" prison conditions, "harassment" of Ivorians with northern names, and violence against women. Significantly, however, the evidence submitted by Kaba did not mention persecution of Dioulas or other northern Ivorians. Moreover, the most current reports reflecting conditions after Gbago's capture on April 11, 2011, indicated that the situation in Cote d'Ivoire had calmed, although order had not returned to some neighborhoods around the capital.

The Board denied the motion to reopen on June 28, 2011, holding that the evidence submitted by Kaba still did not establish his *prima facie* eligibility for asylum. Kaba then filed a petition asking us to review the Board's denial of reopening. That petition (No. 11-3760) was later consolidated with Kaba's initial petition (No. 11-3219). Although Kaba's brief also asks us to grant his request for asylum, the sole issue he raises on appeal

appears to address only the propriety of the Board's denial of the motion to reopen, specifically "[w]hether conditions have changed in Ivory Coast since the evidence was closed on January 27, 2010 [the date of the immigration judge's denial of asylum], so as to require a remand to the Immigration Court for consideration of the Petitioner's claims in light of changed circumstances."

## DISCUSSION

"We review a denial of a motion to reopen for abuse of discretion." *Mezo v. Holder*, 615 F.3d 616, 620 (6th Cir. 2010). "The Supreme Court has made clear that reopening is discretionary with the [Board] and that the [Board] retains broad discretion to grant or deny such motions." *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007) (citing *INS v. Doherty*, 502 U.S. 314, 323 (1992)). Moreover, "[b]ecause the [Board] has such broad discretion, a party seeking reopening or reconsideration bears a heavy burden." *Id.* (citation and internal quotations marks omitted). As a result, we will overrule the Board only if "the denial 'was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group.'" *Acquaah v. Holder*, 589 F.3d 332, 334 (6th Cir. 2009) (quoting *Bi Feng Liu v. Holder*, 560 F.3d 485, 490 (6th Cir. 2009)).

A motion to reopen "shall state the new facts that will be proven . . . and shall be supported by affidavits or other evidentiary material" and "must be accompanied by the

appropriate application for relief and all supporting documentation." 8 C.F.R. § 1003.2(c)(1). The motion "shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." *Id*. Alternatively, the Board may deny the motion if the movant fails to establish *prima facie* eligibility for the relief sought. *See Doherty*, 502 U.S. at 323; *Zhang v. Mukasey*, 543 F.3d 851, 854 (6th Cir. 2008). Kaba thus bears the "heavy burden" of establishing that, if the proceedings were reopened, the new evidence would likely change the outcome of the case. *Matter of Coelho*, 20 I. & N. Dec. 464, 473 (BIA 1992).

In denying Kaba's initial appeal, the Board held that, because of a fundamental change in circumstances in Cote d'Ivoire between 2002, when Kaba left the country, and 2010, when the immigration judge denied relief, Kaba could not establish a well-founded fear of future persecution. In his motion to reopen in front of the Board, Kaba argued that, in the months following the merits hearing in his case, conditions in Cote d'Ivoire deteriorated "so as to require a remand to the Immigration Court for consideration of his claims in light of changed circumstances." After analyzing the evidence attached to the motion, the Board found that Kaba still could not make out a *prima facie* case of his statutory eligibility for asylum.[2]

---

[2] As previously noted, Kaba argued that he was entitled to a presumption of future persecution based on past persecution, apparently referring to the provision in 8 C.F.R. § 1208.13(b)(1). The Board explicitly declined to address Kaba's credibility and whether or not he had established past persecution. Instead it determined that, even if Kaba were entitled to the presumption, it had been rebutted by the government's evidence of changed country conditions, as permitted under § 1208.13(b)(1)(i)(A).

We agree. Under standards adopted by the Board, *prima facie* evidence is proof that "reveals a reasonable likelihood that the statutory requirements for relief have been satisfied." *In Re S-V-*, 22 I & N Dec. 1306, 1308 (BIA 2000). The Attorney General has the "discretion to grant asylum to a refugee who shows that [he] has suffered past persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion,' or that [he] has a well-founded fear of future persecution on these grounds." *Bi Xia Qu v. Holder*, 618 F.3d 602, 606 (6th Cir. 2010) (quoting 8 U.S.C. § 1101(a)(42)). To establish a well-founded fear of future persecution, an asylum applicant must demonstrate: "'(1) that [he] has a fear of persecution in [his] home country on account of race, religion, nationality, membership in a particular social group, or political opinion, (2) that there is a reasonable possibility of suffering such persecution if [he] were to return to that country, and (3) that [he] is unable or unwilling to return to that country because of such fear.'" *Id*. (quoting *Singh v Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005)). A well-founded fear of future persecution can be based either on a likelihood of harm specifically targeted at the applicant or a pattern or practice of harm to others similarly situated. *See Akhtar v. Gonzales*, 406 F.3d 399, 404 (6th Cir. 2005) (citation omitted); 8 C.F.R. § 208.13(b)(2)(iii).

---

The dissenting judge asserts that "for purposes of this appeal, Kaba is entitled to a presumption that he had a well-founded fear of future persecution" but fails to locate the basis for such an entitlement. As indicated above, such a presumption results from proof of past persecution. However, there is no finding by either the immigration judge or the Board that Kaba suffered past persecution. The most that the record demonstrates is an *assumption* of past persecution by the Board, one obviously presented *arguendo* and, therefore, completely hypothetical in nature.

In this case, the Board determined that Kaba had not met the "heavy burden" of establishing that the new evidence would change the result in his case, stating:

> We agree with [the Department of Homeland Security] that the respondent has not submitted material evidence demonstrating his *prima facie* eligibility for asylum. First, although the background evidence discusses violence and the overall poor conditions in the [Cote d'Ivoire], this evidence does not alter our prior finding that there has been a fundamental change in circumstances in [Cote d'Ivoire] due to the intervention of the United Nations and the death of the gendarmes that allegedly detained and beat the respondent. Further, the government held its fi[r]st presidential election in 10 years and the leader in charge during the respondent's alleged past persecution, President Laurent Gbagbo, was ousted from power in April 2011. Moreover, as observed by [the department], the background documents submitted by the respondent reflect conditions of general civil strife, which impact the country as a whole, and do not demonstrate the respondent's *prima facie* eligibility for asylum.

The record fully supports the Board's determination. The documents that Kaba submitted in connection with his motion to reopen describe general instability and a number of instances of violence between pro-Ouattara and pro-Gbagbo forces during the fallout from the disputed presidential election. But Kaba does not argue that he is a member of either political group or that there has been systematic persecution of Dioulas or northern Ivorians by the current government. Although the 2010 country report does refer to violence in Kaba's hometown, Kaba does not allege that Dioulas face greater risks than other Ivorians. In fact, the circumstances alluded to in the motion to reopen affect every resident of Cote d'Ivoire.

Hence, what Kaba identifies is "civil unrest between competing political factions . . . not persecution." *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004) (citation and internal quotation marks omitted). The only evidence indicating that Kaba was at risk for individualized persecution was the alleged phone call to his aunt, back in 2003, but there was no evidence in the record to corroborate this claim. As a result, the Board did not abuse its discretion in determining that this isolated incident, even if proven, was insufficient to support a finding of well-founded fear of future persecution. *See Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007) ("[A]n applicant cannot rely on speculative conclusions or mere assertions of fear of possible persecution, but instead must offer reasonably specific information showing a real threat of individual persecution." (citation and internal quotation marks omitted)).

In summary, Kaba claims that "reasonable persons are afraid to return home . . . because of the climate of fear," but he has presented no evidence indicating that he might be singled out if he is deported to Cote d'Ivoire.[3] It is well established that "conditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Ali*, 366 F.3d at 410 (citation omitted). Because Kaba has not demonstrated "more than the existence of a generalized or random

---

[3]Although Kaba contends that the motion to reopen introduced new evidence demonstrating that country conditions had "devolved into a disaster of international scale," none of his evidence rebuts the Board's conclusion that the fall of Gbagbo and the presence of international peacekeepers virtually eliminated the risk of persecution of Kaba individually. The evidence attached to the motion is largely irrelevant to his asylum claim. *See Liti v. Gonzales*, 411 F.3d 631, 639 (6th Cir. 2005) ("Though the documents submitted by the [respondents] detail a number of instances of violence, corruption, and protest within the country, nothing specifically supports their claim that were they to return, they would be persecuted.").

possibility of persecution," he has not established a *prima facie* case for the relief sought.

*Castellano-Chacon v. INS*, 341 F.3d 533, 550 (6th Cir. 2003).

**CONCLUSION**

The evidence in the administrative record before us supports the immigration judge's determination that Kaba failed to establish a *prima facie* case for the relief sought. It likewise supports the Board's orders dismissing his appeal and denying the motion to reopen. We therefore DENY the consolidated petitions for review.

**HELENE N. WHITE, Circuit Judge,** dissenting.

Because I believe that the government did not establish by a preponderance of the evidence that changed country conditions in Cote D'Ivoire obviated Kaba's fear of future persecution, I respectfully dissent.

In considering the BIA's dismissal of Kaba's appeal from the IJ decision denying Kaba's asylum claim, we review the BIA's legal determinations de novo and its factual conclusions for substantial evidence. *Sanusi v. Gonzales*, 474 F.3d 341, 345 (6th Cir. 2007). Under the substantial evidence standard, the BIA's findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (citations omitted).

The BIA did not address whether Kaba had established past persecution, but instead determined that assuming Kaba had faced past persecution, there was a fundamental change of circumstances that rebutted the presumption of future persecution. To reach that conclusion, the BIA agreed with the IJ's holding that,

> [T]he end of the civil war in the Ivory Coast, the intervention of the United
>
> Nations, as well as the death of the gendarmes that allegedly detained the
>
> respondent in 2002, establish that the respondent's fear of returning to the
>
> Ivory Coast is no longer objectively reasonable.

The BIA further found that "[w]hile the Department of State Country Reports and other objective evidence contained in the record do discuss the overall poor conditions in the Ivory Coast, none of this evidence specifically discusses the respondent." Accordingly, the BIA held that Kaba had not established a well-founded fear of future persecution.

Because for purposes of this appeal Kaba is entitled to a presumption that he had a well-founded fear of future persecution,[1] the burden is on the government to establish by a preponderance of the evidence that changed country conditions in Cote D'Ivoire obviate that fear. *Vincent v. Holder*, 632 F.3d 351, 356 (6th Cir. 2011). Kaba argues that the end of the civil war, the intervention of the United Nations, and the death of the gendarmes who detained him are each insufficient to rebut this presumption.

The third reason cited by the BIA—that the gendarmes who detained Kaba in 2002 were subsequently killed by rebels—clearly cannot support a finding that Kaba no longer had a well-founded fear of persecution. Kaba never alleged that he was personally being targeted by specific individuals, but rather that the government's security forces were targeting Dioulas as a group because the government believed Dioulas were members of

---

[1]Because the BIA proceeded on the assumption that Kaba suffered past persecution, we must proceed on that basis on appeal. The logic of this position is self-evident. If a lower tribunal concedes an issue in a party's favor, the appellate tribunal cannot deny the party the benefit of that concession in deciding the issues on appeal. Hypothetical or not, our review proceeds on the assumption that Kaba suffered past persecution. Further, the statute provides that where there is past prosecution, the petitioner enjoys the presumption of a well-founded fear of future prosecution. *See* 8 C.F.R. § 1208.13(b)(1). That presumption does not disappear where the past persecution is assumed *arguendo*. The BIA recognized this and found that the presumption had been overcome. The only issue in this appeal is whether that finding is adequately supported by the record. Hence, in this appeal, Kaba is entitled to the presumption of a well-founded fear of future prosecution.

rebel groups, and that Kaba was persecuted on account of that belief. Accordingly, that the specific individuals who detained him may have died has no bearing on whether Kaba continues to have a well-founded fear of persecution by government security forces on account of his status as Dioula.

The first two reasons cited—the end of the Civil War and involvement of the United Nations—theoretically offer greater support that the country conditions have fundamentally changed. However, on the basis of the 2008 U.S. State Department Human Rights Report, upon which the government primarily relied to argue that the country conditions had changed, it is a close case whether the government could have carried its burden to rebut the presumption to which Kaba was entitled. Although the report notes that the President and rebels signed the Ouagadougou Political Agreement (OPA) in 2007 to hold elections and dismantle the "zone of confidence" dividing north and south Cote D'Ivoire, which resulted in some improved civil administration and the distribution of birth certificates, the report notes that "implementation of other key tenets of the OPA—including disarmament of armed factions and determination of citizenship—remained incomplete." The report also noted that "[t]he government's human rights record improved slightly during the year but continued to be poor," and that "[s]ecurity forces continued to commit extrajudicial killings with impunity, and government militia groups were responsible for killings, disappearances, and harassment. These crimes often went unreported or underreported due to fear of reprisals." The report specifically attributes some of the violent crimes to progovernment militia groups and gendarmes, which are the same groups, led by the same government

leaders, that Kaba alleged imprisoned him in 2002.[2]  Although the report does not mention Kaba's ethnic group by name, it does note that "police officers continued to extort bribes from persons of northern origin or with northern names," such as Kaba.  And nothing in the report suggests that Kaba's ethnic group had ceased to be a target, or that his town had become peaceful.  *See Berishaj v. Ashcroft*, 378 F.3d 314, 327 (3d Cir. 2004) (agreeing with every Court of Appeals that has so far considered the issue, that "evidence of changed country conditions can successfully rebut an alien's fear of future persecution based on past persecution only if that evidence addresses the specific basis for the alien's fear of persecution; generalized improvements in country conditions will not suffice as rebuttals to credible testimony and other evidence establishing past persecution"), *abrogated on other grounds*, *Nbaye v. Attorney General of United States*, 665 F.3d 57, 59–60 (3d Cir. 2011).

---

[2]The government of Cote D'Ivoire was led by former President Gbagbo at the time of the civil war in 2002 as well through the rest of the decade.  He was arrested in April 2011, a fact which may have bearing on the motion to reopen, but which this Court may not consider in evaluating whether the BIA erred in its  initial dismissal of the appeal.  *Lin v. Holder*, 565 F.3d 971, 978–79 (6th Cir. 2009) (holding that this Court may not take judicial notice of facts, including country reports, outside the administrative record).  For the same reason, the supplemental cases submitted by the government, which stand for the proposition that a presumption of past persecution may be rebutted in political persecution cases by a showing that the persecutor is no longer is in power, are also not relevant.  Even if this Court could take judicial notice of the fact that Gbagbo was arrested, those cases deal with political persecution, not ethnic persecution, and in any event do not establish a *per se* rule that a leader's removal from power rebuts a presumption of future persecution.  *See e.g. Trifoni v. Holder*, 351 F. App'x. 19, 23 (6th Cir. 2009) ("[T]he Government can *often* rebut the presumption in political persecution asylum cases by showing that the applicant's persecutors are no longer in power.") (emphasis added); *Chieh v. Holder*, 411 F. App'x 800, 803 (6th Cir. 2011) (upholding the BIA's finding that Charles Taylor's "removal from power [in Liberia], and the salutary changes flowing from the ouster, established that [petitioner's] fear of future persecution . . . is not well founded").

Kaba argues that the OPA has had virtually no effect on the conditions in Cote D'Ivoire. In fact, an article that was included in the administrative record notes that a UN Panel was warned of escalating violence "as parties are rearming despite an UN arms embargo imposed since 2004." The BIA cited *Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006), in rejecting Kaba's contention that the presumption of future persecution cannot be rebutted solely on the basis of a Department of State Country Report. However, in *Ramaj*, the applicant sought asylum based on persecution in Albania on the basis of various political activities, but an IJ found that the country reports established that in recent years a consensus had developed among international and nongovernmental organizations that "Albanians have been able to exercise freely their right to change their government through democratic means and that such a right includes the ability to organize and campaign broadly, free from government interference." *Id.* at 523, 531. This Court found that those reports constituted substantial evidence supporting the conclusion that the country conditions had improved to the point of rebutting a presumption of a well-founded fear of future persecution. *Id.*

Here, the country reports are not nearly as clear-cut. Although the parties to the conflict signed an agreement to hold elections, the reports did not establish that the parties to the conflict had disarmed or disbanded. On the other hand, the government is correct to assert that the civil war of 2002–03 had ended and the United Nations had deployed peacekeepers to the country in 2004. But on the basis of reports of continued violence committed by the same forces, and directed towards the same rebel groups towards which

it was directed in 2002, it is more than likely that substantial evidence does not support the conclusion that the government has established that the changes in the conditions are so fundamental that they are sufficient to rebut the presumption that Kaba's fear is well-founded.

Accordingly, I would vacate the BIA's finding that Kaba has not established a well-founded fear of future persecution, and remand to the BIA to rule on whether Kaba was credible and whether he established past persecution.